WELLS, Judge.
Distribution Management Services, Inc. and Leo Greenfield (collectively “DMSI”) appeal from final orders approving a magistrate’s final report and authorizing disbursement of escrowed funds. We affirm.
*7 In April of 2003, DMSI contracted to sell a parcel of real property and the recycling plant located on it for $1.05 million to Southern Waste Systems, Ltd. (“SWS”). Because the recycling plant was being operated by a third party, the contract made reference to and incorporated the third party’s operating agreement which provided the operator with the option of either continuing to operate the recycling plant for an additional five years or purchasing the recycling plant outright. In addition to the operating agreement, the contract referred to and incorporated by reference a letter of intent, alleged by SWS to be fraudulent, which permitted DMSI, upon “payment to Southern Waste Systems (“SWS”) of the sum of Eight Hundred and Fifty Thousand ($850,000.00) Dollars,” to rescind the sale to SWS if the third party operator exercised its option to continue operating the plant.
In December 2003, the third party operator exercised its option to continue operating the plant. DMSI claims to have then purchased the right to operate the plant from the third party and to have exercised the option accorded by the letter of intent by tendering $850,000 to SWS to rescind the sale. SWS refused, however, to cede either ownership or the right of possession to DMSI and brought suit primarily to quiet title to the property and to resolve DMSI’s claims to possession and ownership.[1] DMSI counterclaimed for essentially the same relief.[2]
On May 19, 2004, the parties appeared before a general magistrate on their pending injunction motions, each party essentially seeking possession of the property and the damages flowing from the other’s wrongful possession. At that time, they stipulated on the record that General Magistrate John Farrell would resolve the equitable claims (the primary claims in the action) within sixty days. They also agreed that SWS would deposit $450,000 in a joint interest bearing account to satisfy the damages DMSI sought for breach of contract (counterclaim Count II) and wrongful use of escrow funds (counterclaim Count IV) should DMSI prevail on the ownership claim. The parties also waived exceptions to the magistrate’s conclusions.
After this agreement was dictated into the record and agreed to by counsel for the parties, the magistrate reminded the parties that he could not conduct a jury *8 trial and advised the parties that they had “to work that out and decide how [they] want to do it.” DMSI’s counsel asked for ten days in which to decide whether it would waive its jury trial demands.
On June 3, 2004, DMSI advised that it would not waive its right to a jury trial. It then moved to vacate the stipulation claiming that the stipulation was nullified by exercise of its jury trial demand. The motion was denied.
On September 30, 2004, SWS filed its motion for partial summary judgment on its equitable claims[3] and on those counterclaims which necessarily would be determined if it prevailed on its equitable claims.[4] On November 16, 2004, the magistrate issued a report concluding that DMSI had not made a proper tender to repurchase the property as required by the letter of intent, and, therefore, as a matter of law, SWS was entitled to summary judgment in its favor. Thus, the magistrate concluded that SWS was entitled to possession of the property and DMSI was not entitled to any of the $450,000 that had been put into escrow to cover DMSI’s damages in the event that it had prevailed on its counterclaims. DMSI’s exceptions to the magistrate’s report were overruled by the trial court, and the $450,000 escrow was ordered released to SWS.
DMSI appeals these determinations arguing that “the sole reason” for the stipulation to try this matter before a magistrate was “to have a jury trial on an expedited basis,” and that once it refused to waive its right to a jury trial, the stipulation became a nullity. It also contends that the trial court erred in failing to entertain its exceptions to the magistrate’s report; in approving the magistrate’s conclusion that it had not properly exercised the option to rescind/repurchase the property and plant; and in releasing the es-crowed funds following entry of judgment. We find no merit in any of these arguments.
DMSI’s argument that the “sole reason” for the stipulation was to have an expedited jury trial is belied by the record:
THE COURT: Are we ready to read the agreement? Would you do the lead, Mr. Homer [counsel for SWS]?
MR. HOMER: I will.
THE COURT: All please pay attention.
MR. HOMER: Frank [Marks, counsel for DMSI], do you want to come up before we start?
THE COURT: Before we start, the rules are that if there is any disagreement, we’ll stop right at that moment and iron out whatever the disagreement is, if there is any disagreement, rather than wait until the end and go back and try to recapitulate, all right?
MR. HOMER: Yes, sir.
THE COURT: Fine.
MR. HOMER: Okay. First thing that we agree is that we are going to adjourn the hearing today subject to the terms and conditions that I am going to announce.
First is my client, SWS, is going to post a $450,000 cash bond that’s going to be — rather than with the circuit court is going to be placed at a financial institu *9 tion in an interest bearing capacity, and the two law firms agree to be what we’ll call custodians for that and have signatory authority over that account.
That $450,000 will act as an indemnification — potential indemnification against loss caused to Mr. Greenfield’s company, DMSI, caused by the depravation [sic] of the operation of the property from this date until we get a resolution of this matter. The equivalent of what would normally be a wrongful injunction bond.
Subject to the court’s availability, we would agree upon a specific final hearing date and consolidate the final hearing on the merits with what would normally be an injunction hearing; and we’re proposing the final hearing date will start in 61 days, which will be Monday, Jply 20th, provided Your Honor is available. We estimate that we would need three days for that hearing.
What would be the outcome of that hearing would be that there would be a declaration of the party’s respective rights, obligations and liabilities. That the court could enter injunctive relief that the party — either party to vacate the premises and not to interfere with the other party’s rights to the property and also to direct that either party engage in further assurances by way of executing documents and things like that.
In order to accomplish that we would have a discovery schedule which would be done on an expedited basis....
There would be pretrial disclosures which would be done five business days before the final hearing....
As I indicated, the hearing would take place in 60 days....
We would agree to consolidate the eviction/possession issues which are over in county court in this proceeding here. We would agree that General Master Farrell will be the one who will be ... making the final adjudication on all of these issues, and any issues that would pop up about the enforcement of this would be directed to General Master Farrell as opposed to the judge.
There would also be an agreement so that we can make this a final order where each party agreed to waive any exceptions to your ruling and would make it a final appealable order to the appellate court, if necessary.
In the interim SWS or its affiliates would operate the property and that contemplates that there would be a turnover this Friday. SWS would have an obligation to remove the existing recyclable materials which are there....
In addition, there are [sic] certain personal property owned by DMSI, which we have already identified, which on Friday there would be a turnover of that from my client to DMSI.... We contemplate that there will be a takeover on Friday.
After that point in time my client would be operating the property and there would be no interference of that by DMSI or any of its principals.
My client would generate financial reports. Those would be done on a monthly basis and will timely provide those to counsel and to Mr. Greenfield.
In order to assure that there would be no cash that would be mishandled, they will get a videotape system up and running that would reflect all transactions; and that during normal business hours my client would hire a mutually agreeable off-duty policeman or law enforcement officer who would be there to observe what was going on there.
Mr. Greenfield indicated he would impart his knowledge of what that person should be looking for to make sure that *10 there aren’t any under-the-table cash transactions or anything like that.
MR. MARKS: There should also be a gag order....
MR. HOMER: That wasn’t anything that was discussed.
MR. MARKS: No.
THE COURT: I would suggest that we should refrain from trying to address that before we reach a conclusion of these proceedings. Not passing on this at this time because it is not necessary to do it, but at that time if you bring it back up, Mr. Marks, without prejudice, we’ll address the entire matter at that time.
MR. MARKS: Okay.

MR. HOMER: I think that’s it.

MR. BLOOM: May I make a suggestion? I don’t know how good it is, but I think it is a good one. This property has been in contention for a long period of time apparently. I think there ought to be some kind of order or a piece of paper that says that SWS is in possession of the property and the owner of the property pending further order of court or something to that effect so that someone going to the property, there is something that they can show the person.
MR. HOMER: I submit Mr. Greenfield is not against that, but just a variation on that, Mr. Greenfield, let me suggest this.
Without making any intimation of what the final outcome of this is, pursuant to this proposed agreement, we can have an order entered by the General Master that says SWS, pursuant to agreement of the parties, is entitled to operate the property until further order of the court.
MR. MARKS: That’s fine. No objection to that.
THE COURT: I think that’s satisfactory.
MR. MARKS: Without reference to who the owner is.
THE COURT: Okay.
MR. HOMER: Okay.
THE COURT: That’s fine.

MR. HOMER: That’s what I have got.

MR. MARKS: That’s it.

MR. GREENFIELD: The personal property would be removed.

MR. MARKS: He covered that. That’s our understanding of the agreement.

[[Image here]]

THE COURT: Anything further?

MR. MARKS: That’s it, your Honor.

(Emphasis added).
This agreement makes no mention of a jury trial nor is it predicated on such a proceeding. Rather the purpose, as expressed, was to expedite resolution of the main issues raised in this action, that is, for “a declaration of the party’s respective rights, obligations and liabilities ... [for] injunctive relief.” ■
The magistrate’s statement that he could not conduct a jury trial does not support DMSI’s argument that the only purpose in entering the stipulation was to secure an expedited jury trial. Rather, the magistrate’s comment only reflects his failure to realize that the parties’ agreement to escrow funds to satisfy DMSI, should it prevail, resolved the only viable claim (Count II of the counterclaim) for which a jury trial had been sought.[5]
*11 Specifically, in Count II of the counterclaim, DMSI claimed that it was the owner of the property entitled to possession of the plant and that as a consequence of its improper ouster by SWS, it was incurring $7000 in damage each day. As part of the parties’ stipulation, SWS agreed to escrow $450,000 to act, as the magistrate was advised, as “potential indemnification against loss caused to ... DMSI, caused by the depravation [sic] of the operation of the property from this date until we get a resolution of this matter.” What the parties failed to adequately explain was that this $450,000 was comprised of two components: $420,000 to satisfy Count II of the counterclaim (that is, $7000 per day for the sixty days the parties agreed it would take to get to trial) which carried a demand for a jury trial; and $30,000 to satisfy Count IV of the counterclaim for that amount.[6]
In sum, the magistrate’s cautionary statement concerning his inability to conduct a jury trial, made after the parties agreed to resolve the claims then pending before him, including the only viable claim in which a demand for a jury trial, had been made, evidenced a lack of recognition regarding the effect of the $450,000 escrow account. It does not stand as proof of DMSI’s claim that the purpose of the stipulation was to assure an expedited jury trial.
The trial court also did not err in adopting the magistrate’s resolution of the parties’ claims. Although DMSI expressly agreed to waive exceptions to the magistrate’s report, the trial court nonetheless entertained DMSI’s exceptions, reviewed the record before the magistrate, and rejected the exceptions. See Nail v. Browning, 74 Fla. 108, 76 So. 679, 680 (1917) (approving a stipulation waiving both exceptions to a master’s report and the right to appeal).
We similarly find no error in the determination that DMSI was entitled to neither ownership nor possession of the property because it failed to tender pay *12 ment as required by the letter of intent. See Rissman v. Kilbourne, 643 So.2d 1186, 1140 (Fla. 1st DCA 1994) (noting that a tender is an unconditional offer of payment, and that the “only distinction between tender and payment lies in the fact that a tender is not accepted, while a payment is”); see also Southfork Inv. Group, Inc. v. Williams, 706 So.2d 75, 79 (Fla. 2d DCA 1998) (citing Rissman for the proposition that “[t]o make an effective tender, the debtor must actually attempt to pay the sums due; mere offers to pay, or declarations that the debtor is willing to pay, are not enough”).
In light of these conclusions, there was no error in releasing the escrowed funds to SWS.
Accordingly, we affirm both orders appealed.

. SWS sought to recover payments made by the third party operator to DMSI after SWS purchased the recycling plant (Count I for breach of contract); for ejectment to' obtain possession of the property and plant (Count II); to quiet title (Count III); to enjoin DMSI from claiming ownership of the property and from obstructing SWS’s right to occupy the premises and operate the recycling plant (Count IV for injunctive relief); for conspiracy to commit fraud and fraud (Counts V and VI respectively); for breach of fiduciary duty as to an SWS shareholder regarding the sale of the property and the recycling plant (Count VII); and for slander of title (Count VIII).

. DMSI counterclaimed for injunctive relief for possession and control of the recycling plant claiming that it had exercised its option to rescind the sale and that by virtue of recor-dation of a deed previously held in escrow that it was the owner of the property and plant (Count I). It sought damages stemming from closure of the plant because of SWS’s alleged wrongful refusal to rescind the sale and turn over possession (Count II for breach of contract). It also sought damages for SWS’s alleged fraudulent failure to include the letter of intent authorizing rescission of the sale as part of its attachments to SWS’s complaint (Count III for fraud), and for SWS’s alleged breach of contract relating to use of $30,000 escrowed as part of the sale (Count IV). It also asked for specific performance of the sales contract and letter of intent (Count V). Count II for damages stemming from closure of the plant and Count III for fraud made jury trial demands.

. SWS moved for summary judgment on Counts II (ejectment), III (quiet title), and VIII (slander of title) of its amended complaint.

. SWS sought entry of judgment on Count I (injunctive relief), Count II (breach of contract), and Count V (specific performance) of DMSI’s counterclaim and on Count II (malicious business interference) of Greenfield’s counterclaim.

. The only other count of DMSI's counterclaim that demanded a jury trial was Count Ill alleging that SWS had committed fraud by failing to attach a copy of the letter of intent *11 to its complaint. This claim fails to state any of the essential elements of a fraud claim. See Romo v. Amedex Ins. Co., 930 So.2d 643, 650-51 (Fla. 3d DCA 2006) (stating a plaintiff must allege the following essential elements to state a cause of action sounding in fraud: "(1) a misrepresentation of a material fact; (2) which the person making the misrepresentation knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied on the misrepresentation to his detriment; and (5) that this reliance caused damages”); see also Kish v. A.W. Chesterton Co., 930 So.2d 704, 706 (Fla. 3d DCA 2006) (defining fraud generally as a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment and a misrepresentation made recklessly without belief in its truth to induce another person to act).
Greenfield's counterclaim was not the subject of this stipulation as it was not filed until after the stipulation was entered.

. This point was clarified after judgment was entered when counsel for DMSI stated:
[BY COUNSEL FOR DMSI]: ... The 45 [0] is to compensate the defendants, not for regaining their property or losing it, it’s for being restricted from the ability to garner the revenues that the property would produce.
If I’m not mistaken, there was supposed to be a 60-day — the reason the case goes to the general master is we're going to litigate for 60 days, we’re going to work in good faith to discover the case and have a final hearing in 60 days. There was a $7,000 estimated, agreed-upon number that the property generated as additional revenue other than its substantive value and that’s money that my client will be deprived of it the Court is reversed on appeal.
This money was not an obligation to pay. This money was an insurance fund in the form of if [SWS] wrongfully evicted you, so to speak, you lost your ability to earn this income, you're going to be made whole.